IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EDDIE SARDON, B03076, </br></br> Plaintiff, </br></br> vs. </br></br> CHAD JENNINGS, </br> NICHOLE DUNLAP, </br> C. OSBORNE, </br> K. YOCUM, </br></br> Defendants. | ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. 24-cv-2565-DWD </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

# MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiff Eddie Sardon, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Robinson Correctional Center (Robinson), brings this civil rights action for alleged deprivations of his constitutional rights under 42 U.S.C. § 1983 and RLUIPA. On January 13, 2025, the Court designated claims sufficient to proceed beyond initial review (Doc. 14), it initiated service of process, and it directed the defendants to respond to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 11). Defendants have responded (Doc. 30), and at the Court's direction, Plaintiff has replied (Doc. 32). On June 3, 2025, the Court held an evidentiary hearing to gather further evidence about Plaintiff's access to his religious publication, the Final Call newsletter.

## Background

The operative claims from the Amended Complaint are:

**Claim 1:** First Amendment religious exercise claim against Defendants Jennings, Dunlap, Osborne, and Yocum for their role in denying or delaying Plaintiff's access to his weekly Final Call publication from February 2023 to date (January 2025);

**Claim 2:** RLUIPA claim against Defendant Jennings for Plaintiff's delayed access, or total deprivation of his weekly Final Call publication from February of 2023 to date (January 2025);

At the time of service, the Court discussed Plaintiff's request for injunctive relief as seeking dependable and timely access to his Final Call religious weekly publication, and increased staffing to the mailroom to facilitate timely delivery. (Doc. 14). In the Amended Complaint and Motion, Plaintiff stated he had not received his publication since some time in 2023.[1] In response, the Defendants submitted an affidavit from Defendant Yocum, a mailroom supervisor. (Doc. 30-1). Yocum indicated that she had only taken over as supervisor in January of 2025, and between December of 2024 and April of 2025, she knew of just two limited instances where his publication was delayed or not delivered. (Yocum Decl., Doc. 32-1 at ¶¶ 1, 9-12). Yocum further indicated that mail processing delays have been reduced, the prison has authorized additional staffing, and she has tried to refine procedures to make sure Plaintiff's publication is timely

---

[1] The Court notes that in a later Declaration, Plaintiff stated he had not received regular access to the publication since October of 2024. (Doc. 25). The Court also notes that in grievances attached to the Amended Complaint, Plaintiff discussed receiving some issues of the publication throughout the winter and spring of 2024. (Doc. 11 at 23) ("The newspaper delivered on Feb. 20, 2024, was not issued to me until March 19, 2024. The newspapers delivered on February 6, 2024, and February 13, 2024, were never issued to me. The newspaper delivered on February 27, 2024, was not issued to me until April 2, 2024. The newspapers delivered to me on March 5, 2024, and March 12, 2024, were never issued to me.").

processed. (*Id.* at ¶¶ ). This statement made it seem that Plaintiff's publications were being timely delivered at this point, regardless of previous problems, so the Court directed him to file a reply brief intended to give an update on the current status of his publications.

In reply, Plaintiff insisted that he still did not have access to the publication. He challenged the veracity of Yocum's declaration. Specifically, he argued that although Yocum indicated she did not initially recognize a mailing as his periodical, her argument was not credible because the periodicals are delivered in a manila envelope that states "periodical" in bold text on the exterior. He submitted a copy of a manila envelope bearing that label. (Doc. 32 at 11).

## June 3, 2025, Hearing

At the hearing, Plaintiff testified that the Final Call publication is a weekly publication. He indicated that he did not recall when he last received a copy, nor did he know which issue of the periodical that may have been. He testified that at best he recalled receiving some dated copies of his periodical about a month ago. He maintained that he still is not receiving regular or routine copies, and that because the issue has persisted for two years, he is now missing somewhere near 100 issues.

On cross-examination, he testified that his family orders his newsletter subscription, but he is not sure who orders it or who paid because different family members take turns providing his subscription. He testified that the only type of subscription his family would buy would be a physical copy, because he did not have a tablet or internet access to view a digital copy. Plaintiff testified that on one occasion, he

received a copy of his periodical while in the law library when Defendant Dunlap simply walked up to him and handed him a copy. He testified that since filing the complaint, his problems accessing the paper have worsened, and have spread to problems accessing other mail as well.

Defendants called Kara Yocum as a witness. Yocum testified that she is responsible for physically receiving and sorting the incoming mail at the prison. As she sorts mail, she sets aside legal mail, certified mail, and periodicals, because those categories get special treatment. Legal mail is given to internal affairs so that it can be opened in the presence of an inmate and inspected for contraband. There is a receipt system for incoming and outgoing legal mail. Certified mail is inspected in the mailroom, and Yocum generates a receipt that she keeps, as well as a receipt for the recipient. Periodicals are separated for quick handling, but they are still subject to an inspection for any form of potential contraband. Yocum testified that many items are considered contraband, such as stickers, markings on the paper in crayon, marker, glitter, or other substances, certain photographs, and much more. If a marking that is considered contraband can be readily seen without opening the envelope, then the mail is immediately returned to the sender for that defect and no record is kept internally, nor is the inmate notified. Once mail has been inspected, Yocum places it in one of twelve mail bags so that it can be disbursed to the appropriate cellhouse. Second shift officers retrieve the bag from the mailroom and bring it to the control area of the housing unit.

Yocum testified that the amount of mail per day can fluctuate greatly depending on the day of week and time of year. She approximated that, for example, on a Monday

she can expect to receive 2,000-3,000 pieces of mail, but that from Halloween thru Valentine's Day, the number is double that or more per day. She processes mail in the order it is received and does not currently have a person to backfill her role if she is absent from the prison for any reason. However, she also testified that for the last seven months or, so she has been authorized to work two hours of overtime per day, and she has also been working on weekends. She believes that a new employee is slated to start working in the mailroom at the beginning of July of 2025. Relevant to this case, she reiterated that she knew of one occasion when a periodical was returned to the sender because a foreign substance was immediately noted on the exterior of the envelope. She was also aware of one delay in delivery because she overlooked the marking on the envelope stating that it contained a periodical, and one issue was delayed because the publisher sent it late. The Final Call newsletter is not delayed due to any content-based screening. She testified that the publication is available for receipt within IDOC, and that there is now a second inmate at Robinson who also receives the publication.

Officer Cody Lorance also testified about his role in Plaintiff's cellhouse. Lorance indicated that after roll call, he retrieves the mail bag and brings it to the control room of the housing unit. Lorance sorts the mail alphabetically by name and posts a list of mail on the control pod window so that inmates can see if they have mail and can retrieve their mail. Lorance generally does not ask inmates to present their ID to gather mail unless he is unsure about who someone is. Lorance testified that he does not withhold mail from Plaintiff. He is aware of Plaintiff receiving copies of the Final Call, as well as

mail enclosed in manila envelopes. He testified that he provided Plaintiff with a copy of the Final Call on May 28, 2025.

## Analysis

As a preliminary matter, to the extent that Plaintiff complains of problems beyond his Final Call publication, he cannot expand the scope of relief sought via motions or affidavits. For example, on March 19, 2025, he filed an affidavit wherein he complained of a publication not being properly handled, but the publication appears to be "The Redemption Manual Handbook" (Doc. 20 at 5), and not a Final Call newsletter. The publication was apparently held up because it contained a sticky substance, and Plaintiff contests that it was not handled per prison procedure. The substantive claims in this lawsuit are *only* about the Final Call newsletter. Issues with other publications are not directly relevant and cannot form a basis for broader injunctive relief. Plaintiff also complains in the same affidavit of broader retaliation or problems with his access to the Courts, but again, these issues are broader than the claims in this lawsuit and cannot form a basis for injunctive relief here. *See e.g.*, *Tatum v. Hunter,* Case No. 22-2411 (S.D. Ill. 2023) (Doc. 16) (denying injunctive relief, including a request for a transfer, where the injunctive relief sought was not narrowly tailored and did not align with the claims in the case) *aff'd in Tatum v. Hunter*, Case No. 23-2253 (7th Cir. May 16, 2024); *Daniels v. Dumsdorff, et al.*, Case No. 19-cv-394 (S.D. Ill. 2019). Plaintiff reiterated at the hearing that since filing this lawsuit his problems with mail have expanded beyond the Final Call newsletter, but any such allegation is beyond the scope of the operative claims and will not be entertained further.

To seek a preliminary injunction, a plaintiff must establish: a likelihood of success on the merits of his claim; no adequate remedy at law; and irreparable harm without the injunctive relief. *See* Mays v. Dart, 974 F.3d 810, 818 (7th Cir. 2020). As for the first requirement, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 804 (7th Cir. 2002). "A movant's likelihood of success on the merits must be strong." Tully v. Okeson, 977 F.3d 608, 613 (7th Cir. 2020). While Plaintiff is not required to "show that [he] definitely will win the case…a mere possibility of success is not enough," and he must make "[a] strong showing that [he] is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). A strong showing typically entails a demonstration of how the applicant intends to prove key elements of his case. Ill. Republican Party v. Pritzker, 973 F.3d 760, 762-63 (7th Cir. 2020); Doe v. University of Southern Indiana, 43 F.4th 784, 791-92 (7th Cir. 2022) (the court is not required to make inferences in the movant's favor when considering preliminary injunctive relief).

The Court must also decide whether an adequate remedy at law exists and whether the plaintiff will suffer irreparable harm without injunctive relief. Irreparable harm is harm which cannot be repaired. Graham v. Med. Mut. Of Ohio, 130 F.3d 293, 296 (7th Cir. 1998) ("Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for. The injury must be of a particular nature, so that compensation in money cannot atone for it."). The Court must then weigh "the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction

on the public interest." *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665.

An injunction that seeks an affirmative act by the respondent is a mandatory preliminary injunction and should be sparingly issued. *Mays*, 974 F.3d at 818. If injunctive relief is warranted, the Prison Litigation Reform Act provides that the injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

Here, Plaintiff's case contains a RLUIPA claim and a First Amendment claim about his ability to access the Final Call publication while incarcerated. The standards for both claims are similar, but RLUIPA generally affords an inmate broader religious liberties, so the Court centers the analysis of preliminary injunctive relief on the RLUIPA standards. "In establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion." *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). If "the plaintiff establishes this prima facie case," the defendant must demonstrate that its "practice is the least restrictive means of furthering a compelling governmental interest" to defeat the plaintiff's claim. *Id.* "RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,'" so long as the "prisoner's request for an accommodation [is] sincerely based on a religious belief and

not some other motivation." *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015) (quoting 42 U.S.C. § 2000cc-5(7)(A)). If the plaintiff establishes a prima facie case, then the defendant must demonstrate that its practice is the least restrictive means of furthering a compelling governmental interest to defeat the plaintiff's claim. *Koger*, 523 F.3d at 796.

The parties do not contest that Plaintiff's receipt of the publication is a form of religious exercise for his religion, the Nation of Islam. However, they disagree about the issue of a substantial burden. If Plaintiff's most favorable version of events is credited, he claims that he has not received access to his religious periodical since April of 2023. (Pltf. Decl., Doc. 11 at 2, ¶ 2). But some of the exhibits to his complaint conceded that he did get issues in the winter and spring of 2024. (Doc. 13 at 22-23) (on March 19, 2024, Plaintiff received a February 2024 issue and on April 2, 2024, he received another February 2024 issue). He also testified that about a month ago he received a number of "dated" copies of the periodical. By contrast, under Defendants' version of events, the mailroom staff receives his publications, subjects them only to typical screening periodicals receive for contraband, and then delivers them. The record contains information about the mail backlog at the prison that is largely consistent over time. In February and April of 2024, staff stated in response to a grievance that mail was about ten days to two weeks behind in processing (Doc. 13 at 21), and in October of 2024, staff stated in a grievance response that mail processing was about two weeks behind (Doc. 13 at 25). In a declaration in response to this Motion, Defendant Yocum indicated that during busy periods mail can be up to two weeks behind, but that as of April of 2025, mail was only seven days behind. (Yocum Decl., Doc. 30-1 at p. 2 ¶ 7). Yocum testified

that the mailroom is always busy from about October to mid-February, which can mean 6,000 or more pieces of mail per day. During slower periods, the mailroom can still receive between 2,000-3,000 pieces of mail per day. Yocum testified that Plaintiff's publication is not substantively screened based on the contents of the paper and is an allowed periodical at the prison. It is screened solely for contraband and was returned on only one recent occasion that she remembers because the outside of the envelope had a substance on it.

Based on the divergent views about the delivery of Plaintiff's publication, the Court must closely examine if Plaintiff's religious exercise is substantially burdened. The Court is not convinced on the evidence available that Plaintiff is completely deprived of his publication, so the analysis is not based on the notion that Plaintiff is entirely deprived of this particular religious exercise. Instead, the question is much narrower. Does a normal processing delay of 7-14 days by the prison's mailroom, caused solely by the volume of incoming mail, constitute a substantial burden on Plaintiff's religious exercise? The Court will ultimately have to examine this question twice in the course of this litigation. For now, it must consider the question in the context of preliminary injunctive relief, and later the question will be reexamined relative to the full merits of the case.

In the limited context of a preliminary injunction, the Court must closely examine the likelihood of success on the merits. At this stage, the Court is not required to make inferences in Plaintiff's favor about his likelihood of success, and it can consider if Plaintiff has adequately suggested he has sufficient evidence to prove the key elements of his case. *Doe v. University of Southern Indiana*, 43 F.4th 784, 791-92 (7th Cir. 2022) (the

court is not required to make inferences in the movant's favor when considering preliminary injunctive relief). Plaintiff has two primary sources of evidence that he has relied upon to demonstrate the untimely receipt or total lack of receipt of his weekly periodical. First, he has submitted a handful of grievances that discuss delayed receipt and alleged non-receipt at several intervals between April of 2023 to July of 2024. Second, he has attested in declarations and has testified to the delayed receipt and non-receipt of his newspaper. The problem with his evidence when examined closely at this juncture is that it tells an inconsistent or strained story. On the one hand, Plaintiff argued at the hearing that over the course of two years he had missed somewhere around 100 publications (which would be nearly every single publication for an entire two year-stint), but on the other hand he has admitted both in testimony and in grievances that he receives issues at a delay.

This subtle distinction matters because Plaintiff has not specifically argued that the *delayed* receipt of issues obstructs his ability to observe this aspect of his religion. Instead, he has only emphasized that the non-receipt of his publication substantially burdens him. The Defendants have established that the mailroom has just one employee, that it can receive anywhere between 2,000-6,000 pieces of mail per day, and that the sole employee works authorized overtime in an effort to keep up with timely mail processing. The consequence of these circumstances is that mail is generally processed 7-14 days after receipt by the facility. The Final Call newspaper is not subject to any extra screening for content and is screened only for contraband like any other publication. It is then delivered to Plaintiff's housing unit, where an officer testified that he regularly sees

Plaintiff's publication and just delivered a copy to him on May 28, 2025. The prison expects to have a second mailroom employee by July of 2025. Because Plaintiff has not argued that the contents of the publication are time-sensitive for purposes of his religious exercise, and because the Court is not convinced he has missed nearly 100 issues, the Court concludes that Plaintiff's evidence at this juncture is not sufficient to support a reasonable likelihood of success on the theory that the delayed delivery is a substantial burden to his religious exercise.

    The Court also notes that Plaintiff has no proof that during the entire two-year period his subscription has been active. What if lapses in his subscription caused some of the periods when he claims he did not receive the publication? He testified vaguely that family takes turns paying for his subscription, but he did not provide any proof about this such as correspondence from them stating it had been renewed, or dates when it was renewed. His facts also do not account for possible delays caused by the generally slow speed of the U.S. Postal Service. Additionally, for how much Plaintiff stresses the significance of this publication to him, he does not seem to have kept clear records of what has happened. One would think that if receipt of the publication was such a significant issue, he would keep very clear notes about the date a publication is printed relative to the date he actually receives it in the prison, and that he would keep very clear notes about how many issues he has received. Instead, when pressed on these sorts of details, Plaintiff is vague, claiming he has no recollection of exactly when he has received issues or what the date of the last issue was that he received. Plaintiff argues the obvious, which is that he cannot have documentary evidence of issues he does not receive, but

nothing would prohibit him from keeping a personal log of all of the weeks when he receives no publication.

Even if the Court assumed that the delay is a substantial burden on Plaintiff's religious exercise, the Court is satisfied for the purpose of the inquiry in the context of a preliminary injunction that the delay is the least restrictive means of furthering a compelling government interest. The prison understandably needs the ability to screen materials arriving at the prison from outside sources before distributing the incoming material to inmates. As Yocum testified, material coming to the prison in the mail can easily be a vehicle for contraband, and within the last month a piece of purported legal mail was found to be laced with drugs. The Court is in no position on the limited record at the preliminary injunction phase of the case to dictate to the prison how it should manage the security aspect of processing thousands of pieces of mail per day. One thing Plaintiff asked for in his demand for preliminary injunctive relief is that the Court simply direct the prison to increase mailroom staffing so that it can process mail faster, but as Yocum testified, a new staff member is slated to start within a month, so to the extent this could improve processing times, the Court finds this satisfactory at this early juncture.

None of the foregoing analysis is meant to say that one side is more likely than the other to ultimately prevail on the merits of this case. The precedential cases surrounding RLUIPA and inmate access to various goods coming into the prison for religious exercise are extensive and complex. The analysis that accompanies the cases is exacting. The Court recognizes that as this case progresses, it cannot simply defer to a concern of general applicability like prison security in determining that a procedure is the least

restrictive means to accomplish a compelling government interest. *Holt,* 574 U.S. at 357-58 (even if the burden results from a rule of general applicability, the government shall not substantially burden an inmate's religious exercise unless the resulting burden is the least restrictive means of furthering a compelling government interest); *Schlemm v. Wall,* 784 F.3d 362 (7th Cir. 2015) (discussing the thorough analysis that accompanies a RLUIPA claim when a religious hinderance is supported by generic reasoning). As the case progresses, the Court will need to closely scrutinize if the prison's mail processing (which delays receipt of periodicals by a few weeks) works a substantial burden on this particular Plaintiff. *Id.* at 363 ("RLUIPA requires us to scrutinize the asserted harm of granting specific exemptions to the particular religious claimants and to look to the marginal interest in enforcing the challenged government action in the particular context."). This sort of analysis will be exacting and will likely involve significant evidence the Court does not yet possess.

As to the other factors for preliminary injunctive relief, such as irreparable harm the burden on the defendants, and public interest, the Court also finds that these factors support denial of the preliminary injunction at this early stage. The Court is not convinced that Plaintiff is being entirely deprived of his publication, and instead finds only that he is suffering from a delivery delay of the publication. He has not explained how the delayed receipt itself works a harm and has not argued that the contents of the publication are time sensitive. It seems on the available evidence that delayed receipt would be far preferable to no receipt, and also that the delays are not attributable to foul play and are simply caused by the sheer volume of work for mailroom staff. On this view

of the facts, the Court is not convinced that the delayed receipt causes irreparable harm. Plaintiff is not entirely deprived of his religious publication; he just does not receive as quickly as he would like. If the likelihood of success on the merits is questionable, the possibility of irreparable harm would have to be quite high to tip the scale in favor of granting preliminary relief. This is particularly so where the grant of any sort of injunctive relief would be burdensome on the prison and would require mandatory action concerning an issue of prison security. For example, if the Court were to contemplate injunctive relief here, it would likely either require a blanket directive that the prison get more mailroom staff (they have already attested this is happening within a month), or it would require a directive that mailroom staff comb thousands of pieces of mail per week to be able to either process Plaintiff's mail faster or to implement a tracking system to at least demonstrate when it comes in and when it is given to him. Any of these options would be quite burdensome on an aspect of prison operations that is already strained, has a high-volume of work, and serves the critical function of reviewing material coming from outside the prison to within its walls. Faced with these circumstances, the weight of the potential burden on the prison greatly outweighs the likelihood of success and the risk of irreparable harm.

For all of the foregoing reasons, the Court finds it appropriate to deny Plaintiff's Motion for a Preliminary Injunction (Doc. 11).

Finally, the Court notes that Plaintiff had a third-party submit an affidavit on his behalf directly to the Clerk's Office. (Doc. 21). Neither Plaintiff, nor this third-party (Juanita Lawson) purport to be attorneys. All "pleading[s], written motion[s], and other

paper[s] must be signed by at least one attorney of record in the attorneys name or by a party personally if the party is unrepresented." FED. R. CIV. P. 11(a).  An individual may appear in the federal courts only pro se or through counsel.  *Lewis v. Lenc-Smith Mfg. Co.*, 784 F.2d 829, 830 (7th Cir. 1986).  Pro se litigants cannot represent others, nor can they bring class action suits.  *See Lawrence v. Sec'y of State*, 467 F. App'x 523, 525 (7th Cir. 2012); *see also Fleece v. Stzrecki*, 2010 WL 4628289 (N.D. Ind. Nov. 5, 2010) (pro se plaintiff barred from bringing case on behalf of his mother). As a pro se individual, Juanita Lawson cannot file documents in this case on Plaintiff's behalf.  Accordingly, the Court will strike Lawson's affidavit and will not consider the substance of this filing.

### DISPOSITION

Plaintiff's Motion for a Preliminary Injunction (Doc. 11) is **DENIED**.

The Clerk of Court is **DIRECTED** to **STRIKE** document 21.

**IT IS SO ORDERED.**

Dated: June 5, 2025

---
DAVID W. DUGAN
United States District Judge

Case 3:24-cv-02565-DWD   Document 39   Filed 06/05/25   Page 17 of 17   Page ID #219